

FILED

08 JUL 11 PM 3:18

NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LOUIS A. TELERICO<br>708 Arbor Way<br>Aurora, Ohio 44202<br><br>Plaintiff,<br><br>vs.<br><br>MERRILL LYNCH, PIERCE,<br>FENNER & SMITH, INC.<br>C/O CT Corporation System<br>1300 East 9th Street<br>Cleveland, Ohio 44114<br><br>and<br><br>XYZ Companies 1-10<br><br>and<br><br>John Does/Jane Does 1-10 | CASE NUMBER: 1:08CV1680<br><br>JUDGE: JUDGE GAUGHAN<br><br>**COMPLAINT**<br><br>*Jury Demand Endorsed Herein*<br><br>MAG. JUDGE PERELMAN |

Now comes Louis A. Telerico, by and through counsel, and for his Complaint

against Merrill Lynch, Pierce, Fenner & Smith, Inc. states as follows:

## **INTRODUCTION**

1. Mr. Telerico is a United States citizen and a Portage County, Ohio resident.

2. Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a Delaware corporation with a principal place of business in the state of New York. Merrill Lynch maintains offices in and regularly does business in Cuyahoga County, Ohio.

3. XYZ Companies 1-10 and John Does/Jane Does 1-10 are entities, other than Merrill Lynch, and individuals whether employed by Merrill Lynch or elsewhere, responsible for interfering with any of the rights which are now, or upon amendment may be, the subject of this litigation. This Complaint will be amended to include names of such entities and/or individuals.

4. The conduct, activity, and injuries that gave rise to the claims set forth in this Complaint occurred in Cuyahoga County, Ohio.

5. This Court has jurisdiction over this case pursuant to Title 28, United States Code Section 1331 as this matter involves federal questions – namely, a claim under the Age Discrimination in Employment Act (ADEA). Additionally, this Court has jurisdiction pursuant to Title 28, United States Code section 1332 as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

6. Venue is proper in this judicial district pursuant to Title 28, United States Code Section 1391, as well as the Local Rules of this Court, given that a substantial part of the events giving rise to this lawsuit occurred within this judicial district.

## BACKGROUND FACTS

7. Mr. Telerico is currently 65 years old.

8. Mr. Telerico started working for Merrill Lynch and its predecessor entities as a financial advisor in the Cleveland-area in 1969. He briefly left the employment of Merrill Lynch in 1971, and then returned in 1972. Thereafter, Mr. Telerico worked for Merrill Lynch continuously until his termination in November 2006.

9. Mr. Telerico did not have a network of clients or a "book of business" when he started working as a young man.

10. Mr. Telerico developed his book of business over a long period of time. Indeed, Mr. Telerico worked for Merrill Lynch and its predecessor entities as a financial advisor in the Cleveland-area for more than three decades.

11. Over the course of his career, Mr. Telerico developed one of the most profitable books of business in the company as compared to all other financial advisors.

12. While it ebbed and flowed like the market itself, over the last decade, Mr. Telerico's book of business routinely generated annual revenues exceeding $2.5 million.

13. In some years, Mr. Telerico's book of business generated annual revenues exceeding $3.5 million, and, in one year, revenues exceeding $7.5 million.

14. Mr. Telerico was the top performing financial advisor in Cleveland for the majority of his career and he was recognized as a premiere performer in the company.

15. Merrill Lynch paid Mr. Telerico on a commission-basis.

16. In fact, Mr. Telerico worked his way up to the highest commission percentage available to financial advisors in the firm – forty to forty-three percent (40-

43%) of the annual revenue generated by his clients through any of the company's investment platforms.

17. Additionally, Mr. Telerico was entitled to receive ninety percent (90%) of the annual production revenues he generated as retail coordinator for syndicate business.

18. Merrill Lynch did not pay any financial advisor in the company a larger commission percentage than it paid Mr. Telerico.

19. Instead, Merrill Lynch paid substantially younger financial advisors in the company much smaller commission percentages than it paid Mr. Telerico.

20. In the Spring of 2006, Brett Thelander was assigned to manage Merrill Lynch's Cleveland office, where Mr. Telerico worked.

21. Mr. Thelander is less than forty years old, and he had never before worked with or even met Mr. Telerico at the time he became manager.

22. Immediately upon his arrival, Mr. Thelander openly commented about Mr. Telerico's age and the fact that he was one of the few full-time employees in the office over 60 years old.

23. Weeks later, Mr. Thelander scheduled a meeting with Mr. Telerico.

24. The meeting took place on May 15, 2006 at a local restaurant.

25. Unbeknownst to Mr. Telerico, the meeting was to discuss his retirement.

26. In fact, the first item of business Mr. Thelander addressed with Mr. Telerico at their meeting was the timing of Mr. Telerico's planned retirement, followed by strong suggestions that Mr. Thelander wanted Mr. Telerico to retire very soon.

27. Mr. Telerico was offended and upset by Mr. Thelander's remarks about retirement and his overall conduct, and he made this clear to Mr. Thelander.

4

28. Mr. Telerico also made it clear to Mr. Thelander that he had absolutely no interest in retiring, and that he planned to work for many years to come.

29. Mr. Thelander expressed displeasure with Mr. Telerico's response.

30. Mr. Thelander then suggested that Mr. Telerico allow portions of his book of business to be distributed amongst substantially younger, lower commission-earning financial advisors.

31. Mr. Telerico made it clear that he was not willing to distribute his book of business.

32. Roughly seven months before Mr. Thelander took over management of the Cleveland office, Mr. Telerico's wife, Elaine Telerico, filed for divorce against him.

33. Elaine Telerico was represented by Vince Stafford, a local attorney.

34. Mr. Telerico's divorce was well known to Merrill Lynch. The firm was even a named defendant in the litigation.

35. On August 24, 2006, roughly three months after Mr. Telerico rejected Mr. Thelander's suggestions that he retire and distribute his book of business to substantially younger, lower commission-earning financial advisors, Mr. Telerico attended a meeting on his pending divorce case, along with his attorneys, Elaine Telerico, and Mr. Stafford.

36. A verbal dispute took place during a confidential settlement meeting on August 24, 2006, between Mr. Telerico and Mr. Stafford.

37. Merrill Lynch knew about the August 24, 2006 meeting as well as the true nature of the dispute – it was an antagonistic settlement conference among aggressive attorneys and parties, and unkind words were directed toward Mr. Telerico.

38. The next day, Mr. Telerico commented in passing to his assistant about the meeting and expressed his disappointment and frustration with its events.

39. Mr. Telerico also was seen in the office watching a video tape about skeet-shooting (in effort to prepare to entertain gun-savvy clients at a Browns football game).

40. On August 28, 2006, Merrill Lynch representatives called Mr. Stafford and told him that they were concerned for his safety due to Mr. Telerico's behavior. At the time, however, Merrill Lynch did not really believe that Mr. Telerico was a threat to anyone.

41. Mr. Stafford contacted the authorities and Mr. Telerico was subsequently arrested. Mr. Telerico was charged with retaliation, menacing by stalking, and aggravated menacing based on Merrill Lynch's "tip" about Mr. Telerico, their top earning, 62 year old, financial advisor who had refused his young supervisor's suggestions to retire.

42. Merrill Lynch then placed Mr. Telerico on an indefinite leave from work.

43. With the trap firmly laid, on October 12, 2006, Mr. Thelander summoned Mr. Telerico to a second meeting to address Mr. Telerico's "retirement."

44. At this second meeting, Mr. Thelander told Mr. Telerico that he was going to "show him how to retire."

45. In response, Mr. Telerico reiterated his desire to keep working for many years and not to retire.

46. Mr. Thelander replied, "maybe you don't understand," and proceeded to explain to Mr. Telerico that his only options were: (a) "retire" with a monetary transition package conditioned upon restrictive covenants (meaning that that he could no longer service his book of business and that the firm could distribute it among substantially

6

younger, lower-commission earning financial advisors) as well as a release of any and all legal claims; or (b) simply leave without any type of monetary transition package.

47. Mr. Telerico asked Mr. Thelander what he was supposed to do if he did not want to retire. Mr. Thelander told him that he would need to "get an attorney."

48. Merrill Lynch was aware of the gravity of their actions – behind the scenes, representatives planned to refer Mr. Telerico to health care professionals, depending on the nature of his reaction to Mr. Thelander ending his career with the firm.

49. After considering his discussions with Mr. Thelander for a few weeks, Mr. Telerico refused to accept the monetary transition package contingent upon the restrictive covenants and a release of claims, and he also refused to "retire."

50. As such, Merrill Lynch forced Mr. Telerico to resign and terminated his employment on or about November 13, 2006.

51. According to Merrill Lynch, it ended Mr. Telerico's thirty-plus year career because his "felony arrest" amounted to "conduct unbecoming of a financial advisor."

52. Notwithstanding, Merrill Lynch has opted not to terminate substantially younger financial advisors under similar circumstances, and much more egregious ones.

53. On January 18, 2007, Mr. Telerico was found not guilty on all criminal counts. A Merrill Lynch executive admitted during the trial that the conduct that gave rise to Mr. Telerico's arrest (which was the basis for his termination) was hardly serious or alarming.

54. Mr. Telerico never executed any restrictive covenants with Merrill Lynch that could prevent him from competing with the firm at any time.

55. However, Merrill Lynch made a calculated and conscious effort to try to make Mr. Telerico "unmovable" in the industry.

56. For example, Merrill Lynch selectively reported and/or failed to correct items concerning Mr. Telerico on his NASD registration forms, which were not similarly handled for substantially younger financial advisors.

57. The negative, and potentially criminal, implications created by Merrill Lynch's post-termination amendment prevented Mr. Telerico from working as a financial advisor at any other major brokerage – the reason for the belated amendment.

58. Also shortly after his termination, Merrill Lynch sent letters to Mr. Telerico's clients, falsely indicating that the "Telerico Group," which Mr. Telerico ran for decades, remained with Merrill Lynch and that it had not changed firms.

59. Having effectively prevented Mr. Telerico from competing with the firm through their unfair and unlawful conduct rather than any type of restrictive covenant, Merrill Lynch distributed Mr. Telerico's book of business among substantially younger, lower commission earning financial advisors, who were both hired to service his clients (primarily with respect to his syndicate business) and reassigned from other duties to support the work (primarily with respect to his traditional investment business).

60. After being kept out of the industry for more than a year, Mr. Telerico found work as a financial advisor with Butler Wick & Co., Inc.

61. With Butler Wick & Co., Inc., Mr. Telerico is trying to rebuild his book of business despite the obstacles created by Merrill Lynch's bad conduct as well as the fact that he cannot conduct any type of syndicate business with this new brokerage.

## FIRST CAUSE OF ACTION
(Federal Law Age Discrimination)

62. The preceding allegations are incorporated by reference as if fully set forth herein.

63. Mr. Telerico is, and at all relevant times was, over 40 years old and is a member of a protected class by virtue of his age.

64. Merrill Lynch subjected Mr. Telerico to adverse employment actions, at least in part, because of his age.

65. Such adverse employment actions include, but are not limited to, terminating Mr. Telerico's employment as a financial advisor (or, alternatively, if Merrill Lynch tries to claim that he "retired" and denies that he was terminated, constructively discharging him after forcing him to face working conditions so intolerable that a reasonable person in his position would feel compelled to resign), selectively reporting items on his NASD registration forms, and completely decimating his book of business and distributing it amongst substantially younger financial advisors.

66. Mr. Telerico was qualified for the position of financial advisor.

67. Mr. Telerico was treated differently from similarly situated, substantially younger, financial advisors.

68. Mr. Telerico was replaced by substantially younger financial advisors.

69. Merrill Lynch's legitimate, non-discriminatory reason for terminating Mr. Telerico – "conduct unbecoming" – was nothing more than pretext for discrimination.

70. Merrill Lynch's conduct violated the Age Discrimination in Employment Act.

71. As a direct and proximate result of Merrill Lynch's unlawful conduct, Mr. Telerico suffered and will continue to suffer economic and non-economic compensatory damages for which Merrill Lynch is liable, including, but not limited to, pain and suffering, emotional distress, and the loss of past and future commissions, salary, wages, benefits, and other privileges and conditions of employment.

72. Merrill Lynch intentionally, willfully, wantonly, recklessly, and maliciously violated Mr. Telerico's rights under the ADEA.

73. Merrill Lynch is liable to Mr. Telerico for past and future economic and non-economic compensatory damages, back pay, front pay, punitive damages, attorneys' fees, expert fees, costs, interest, and any equitable relief that this Court deems appropriate, including reinstatement/re-employment.

74. All necessary procedural, jurisdictional and/or administrative requirements have been met prior to brining this claim in this Court.

## SECOND CAUSE OF ACTION
### (Unfair Competition)

75. The preceding allegations are incorporated by reference as if fully set forth herein.

76. Merrill Lynch made statements and representations to the NASD and, consequently, to other brokerages, and the public, after Mr. Telerico was terminated, for the purpose of deceiving the NASD, other brokerages, and the public into believing that Mr. Telerico was the subject of an NYSE investigation.

77. Merrill Lynch also selectively reported items about Mr. Telerico on his NASD registration forms that it did not similarly report for other financial advisors for the purpose of rendering him "unmovable" in the industry.

78. Furthermore, Merrill Lynch made representations to Mr. Telerico's clients, after Mr. Telerico was terminated, for the purpose of deceiving those clients into believing, among other things, that the Telerico team was still intact and that their accounts would still being managed by the Telerico team as they had been in the past.

79. Merrill Lynch circulated and publicized misleading and false statements, among engaging in many other bad acts, for the purpose harming Mr. Telerico's business.

80. As a direct and proximate result of this unlawful conduct, Mr. Telerico suffered and will continue to suffer economic and non-economic compensatory damages for which Merrill Lynch is liable, including, but not limited to, pain and suffering, emotional distress, and the loss of past and future commissions, salary, wages, and benefits, as well as other benefits employment.

81. Merrill Lynch did the foregoing acts intentionally, willfully, wantonly, recklessly, and maliciously.

82. Merrill Lynch is liable to Mr. Telerico for past and future economic and non-economic compensatory damages, back pay, front pay, punitive damages, attorneys' fees, expert fees, costs, interest, and any equitable relief that this Court deems appropriate.

### THIRD CAUSE OF ACTION
### (Tortious Interference with Business Relations and Prospective Business Relations)

83. The preceding allegations are incorporated by reference as if fully set forth herein.

84. Mr. Telerico had a business relationship and agreements with the clients he serviced during his career spanning more than three decades.

85. Mr. Telerico also had prospective business relationships with these clients, and a host of other individuals throughout the community.

86. Merrill Lynch knew of Mr. Telerico's business relationships and agreements with his clients, and they knew about Mr. Telerico's prospective business relationships.

87. Merrill Lynch intentionally and improperly took actions to cause the termination of Mr. Telerico's business relationships with his clients, and to prevent Mr. Telerico's prospective business relationships.

88. Such intentional and improper actions include selectively reporting items on Mr. Telerico's NASD registration forms, selectively amending Mr. Telerico's NASD registration forms, and failing to notify Mr. Telerico of technical deficiencies with his NASD registration forms in an effort to prevent Mr. Telerico from servicing his clients, and potential clients, as well as sending letters to Mr. Telerico's clients, falsely indicating to those clients, and potential clients, that the "Telerico Group," which Mr. Telerico ran for decades, remained with Merrill Lynch and that it had not changed firms.

89. No privilege exists that permits Merrill Lynch to engage in such actions.

90. As a direct and proximate result of this unlawful conduct, Mr. Telerico suffered and will continue to suffer economic and non-economic compensatory damages for which Merrill Lynch is liable, including, but not limited to, pain and suffering, emotional distress, and the loss of past and future commissions, salary, wages, and benefits.

91. Merrill Lynch did the foregoing acts intentionally, willfully, wantonly, recklessly, and maliciously.

92. Merrill Lynch is liable to Mr. Telerico for past and future economic and non-economic compensatory damages, back pay, front pay, punitive damages, attorneys' fees, expert fees, costs, interest, and any equitable relief that this Court deems appropriate.

## FOURTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

93. The preceding allegations are incorporated by reference as if fully set forth herein.

94. Merrill Lynch intended to cause Mr. Telerico emotional distress or should have known that their actions would result in serious emotional distress to Mr. Telerico.

95. Merrill Lynch's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in civilized society.

96. Merrill Lynch's conduct caused Mr. Telerico psychic injuries.

97. The mental anguish suffered by Mr. Telerico is serious and of a nature that no reasonable person could be expected to endure.

98. As a direct and proximate result of this illegal conduct, Mr. Telerico has suffered, and will continue to suffer, damages, which will be proven at trial.

99. Merrill Lynch's illegal conduct was intentional, willful, malicious, and in reckless disregard for Mr. Telerico's legal rights. Thus, Mr. Telerico also is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Telerico prays for relief as follows:

A. All remedies available under the Age Discrimination in Employment Act, including, but not limited to past and future economic and non-economic damages in an amount in excess of seventy-five thousand dollars, back pay, front pay, lost benefits, reinstatement/re-employment, punitive damages, interest, all attorneys' fees, expert fees, and costs.

B. All remedies available for the claim of Unfair Competition, including, but not limited to past and future economic and non-economic damages in an amount in excess of seventy-five thousand dollars, back pay, front pay, lost benefits, punitive damages, interest, all attorneys' fees, expert fees, and costs.

C. All remedies available for the claim of Tortious Interference with Prospective Business Relations including, but not limited to past and future economic and non-economic damages in an amount in excess of seventy-five thousand dollars, back pay, front pay, lost benefits, punitive damages, interest, all attorneys' fees, expert fees, and costs.

D. All remedies available for the claim of Intentional Infliction of Emotional Distress including, but not limited to past and future economic and non-economic damages in an amount in excess of seventy-five thousand dollars, back pay, front pay, lost benefits, punitive damages, interest, all attorneys' fees, expert fees, and costs.

E.  Any other relief that this Court deems appropriate.

Respectfully submitted,

| | |
|---|---|
| */s/ Avery S. Friedman* | */s/ Andrew A. Kabat* |
| Avery S. Friedman (0006103) | Andrew A. Kabat (0063720) |
| Friedman & Associates | Shannon J. Polk (0072891) |
| 701 The City Club Building | Daniel M. Connell (0078418) |
| 850 Euclid Avenue | Haber Polk, LLP |
| Cleveland, Ohio 44114 | 1111 Superior Avenue |
| P: (216) 621-9282 | Cleveland, Ohio 44114-2584 |
| F: (216) 621-9283 | P: (216) 241-0700 |
| averyfriedman@hotmail.com | F: (216) 241-0739 |
| | akabat@haberpolk.com |
| Counsel for Plaintiff | spolk@haberpolk.com |
| Louis Telerico | dconnell@haberpolk.com |
| | |
| | Counsel for Plaintiff |
| | Louis Telerico |

## **JURY DEMAND**

Mr. Telerico requests a trial by jury on all claims able to be tried in this case.

*/s/ Andrew A. Kabat*
Andrew A. Kabat (0063720)