**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Louis A. Telerico, | ) | **CASE NO. 1:08 CV 1680** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| Merrill Lynch, Pierce, Fenner, and | ) | <u>**Memorandum of Opinion and Order**</u> |
| Smith, Inc., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>INTRODUCTION</u>

This matter is before the Court upon Merrill Lynch's Motion for Summary Judgment

(Doc. 67).  This is an employment discrimination case.  For the reasons that follow, the motion is

GRANTED in favor of defendants with regard to the claims raised in the complaint.  In addition,

the motion is GRANTED IN PART as to liability on count one of the counterclaim.  The Court

*sua sponte* grants summary judgment in part in favor of plaintiff with respect to count one of the

counterclaim.  Plaintiff is also entitled to summary judgment on count two of the counterclaim.

The sole remaining issue in this case is the amount of damages defendant suffered as a result of

1

plaintiff's breach of the FACAAP and Growth Award plans.  Defendant is to submit a motion for

summary judgment on this issue no later than September 14, 2009.  Plaintiff may submit a brief

in opposition no later than September 28, 2009.  Any reply brief is due no later than October 5,

2009.

### FACTS

Plaintiff, Louis Telerico, filed this lawsuit against defendants, Merrill Lynch, Pierce &

Smith, Inc. and Bank of America (collectively "defendant"), alleging wrongdoing in connection

with the termination of plaintiff's employment.

Plaintiff began working for defendant in its Cleveland office in 1973.  By all accounts,

plaintiff was a successful financial advisor, earning over $7 million in commissions over the

years.  About 90% of plaintiff's work consisted of syndicate, or "underwriting," work.

In 1997, plaintiff's son, Mark, joined defendant's training program.  After completing the

program, Mark became a financial advisor for defendant.  Plaintiff, his son, and others formed a

team known as the "Telerico Group."  The team agreed that the "production credits" would be

split 70/30, with plaintiff receiving 70% of the "production credits."  Production credits are

applied to a "grid," which determines the actual commission earned by each individual.  The grid

takes various factors into account, including tenure, in translating production credits into actual

dollars.

Between 2000 and 2006, customers lodged 12 complaints against plaintiff.  During 2001,

the SEC conducted a routine review of defendant's Cleveland business.  After the review, the

SEC advised defendant that it was concerned with the business practices engaged in by plaintiff

and one other financial advisor.  Ultimately, plaintiff was required to give on the record

testimony regarding his practices to the New York Stock Exchange ("NYSE"). The NYSE was satisfied with the written response from the other financial advisor, so it did no require him to provide live testimony. As a result of the fact that on the record testimony was deemed necessary by the NYSE, counsel for defendant, together with its compliance division, determined that the event should be reported to the Central Registration Depository on a Form U-4. Thus, an attorney in defendant's registration department prepared a Form U-4 and sent it to plaintiff and Adam Schoesler, the business manager in defendant's Cleveland office. It appears that both Telerico and Schoesler reviewed and signed U-4 forms.

An internal document shows that the NYSE investigation concluded on July 11, 2005. Although obligated to timely correct registration statements, plaintiff's registration statement continued to carry a notation that "the NYSE *is* conducting an investigation regarding the servicing of customer accounts." A pending investigation is a "red flag" to potential employers and defendant indicated that it would not hire any financial advisor involving in a pending investigation.

At some point prior to 2005, NASD (now FINRA) required that securities dealers, such as defendant, place any financial advisor who received three or more customer complaints in a five year period  on "heightened supervision." Heightened supervision is an attempt to monitor the business practices of a financial advisor and to help ensure that no further customer complaints are filed. A committee consisting of an outside compliance officer, local managers, and the human resources department determines whether to place a particular employee on heightened supervision. There is no set of guidelines or written procedures applied to determine whether heightened supervision should be imposed. Defendant placed plaintiff on heightened

supervision in January of 2006 on the grounds that plaintiff received three or more customer complaints in the five preceding years and was the subject of a regulatory investigation.  An additional customer complaint was filed against plaintiff in March of 2006.

The relationship between Mark and plaintiff became strained.  The two argued regarding the production split and disagreed about investment strategies and client interaction.

In 2005, Elaine Telerico, plaintiff's wife, filed for divorce.  The divorce was highly contentious and Elaine hired Vincent Stafford, an attorney known for being extremely aggressive.  Stafford engaged in boisterous, antagonistic, and insulting behavior.  The divorce proceedings were intense, and plaintiff's attendance at work became sporadic.

During this time period, the "Telerico Group" was deteriorating.  Plaintiff and Mark often fought in the office and the remaining team members were concerned about plaintiff's inattentiveness to clients and absenteeism.[1]  Management was concerned that plaintiff's behavior in the office was causing a "hostile" work environment for the remaining team members.  In fact, by March of 2006, no part of the Telerico Group was preforming well.

In the beginning of 2006, defendant instituted its Client Transition Program ("CTP"), which is a program that allows financial advisors to transition their clients to other financial advisors employed by defendant.  Under the program, the exiting financial advisor receives compensation for assisting in the transition.  The program is targeted to individuals over the age of 55.  In the event younger financial advisors receive the exiting financial advisor's accounts, defendant will likely save money in commissions.  For example, had plaintiff opted to resign pursuant to the CTP, defendant may have saved money.  The primary goal of the CTP is to allow

---

[1]        It appears that the remaining team members were support staff.

4

defendant to retain business upon exiting employment and allow other financial advisors to build a relationship with the clients.

In early 2006, Brett Thelander became the director of the Cleveland office.  Shortly after his arrival, Thelander met with plaintiff.  According to plaintiff, Thelander asked plaintiff when he planned on retiring.  In response, plaintiff indicated that he had no intention of retiring.  Plaintiff further testified that Thelander indicated that he was looking for people willing to retire in order to redistribute their business.  Thelander also discussed the possibility of plaintiff's retirement with Mark.

On August 24, 2006, a settlement conference occurred in an effort to resolve the divorce proceedings.  During the conference, Stafford verbally mocked plaintiff and repeatedly insulted him.  For example, Stafford referred to plaintiff as having "fake teeth" and said, "you're not going to cry now, are you?"  In response, plaintiff stated that he believed Stafford was unethical and churned his bills.  He stated that Stafford would "go down" for his behavior.  According to his testimony, plaintiff meant that Stafford would "go down" in a legal sense.  In an effort to avoid any further incident, plaintiff's attorney helped him move to an adjacent room.  Not surprisingly, the settlement conference was unsuccessful.

The following day, plaintiff told Trudi Miner and Rita Colvert, two of his team members, about the settlement conference.  Plaintiff told them to "pack up their stuff."  According to Miner, plaintiff told her that he was going to "blow [Stafford's] f—ing head off."  In addition, plaintiff indicated that he would be willing to go to jail before letting Stafford "get away" with his actions.  Plaintiff denies having made these statements.

The following Monday, plaintiff arrived at work and asked Miner to assist him in playing

5

a DVD on his computer.  Miner and Colvert observed plaintiff watching a DVD about shotguns and writing down certain model numbers.  The DVD apparently discussed the manner in which a shotgun is used in skeet shooting.  They became concerned over plaintiff's behavior.  When Mark arrived at the office, Miner told him about the incident.

Soon thereafter, Adam Schoesler, a member of defendant's management team, and Ari Jaffe, plaintiff's divorce lawyer,[2] were contacted.  Schoesler and Jaffe confronted plaintiff about the DVD.  Plaintiff explained that he was learning how to shoot skeet in order to prospect certain clients.  Jaffe took the DVD and both Schoesler and Jaffe discussed the situation with Miner and Colvert.  In notes prepared later that day, both Miner and Colvert indicate that the day was very scary.  Even in the face of plaintiff's explanation, Miner indicated that she "still fears for what [plaintiff] is actually contemplating."  She further indicated that "the work environment should be one where you feel safe and until this is completely resolved I work in fear [as] well as my team members."  Similarly, Covert indicated that it had been a "very scary day" and that she is not "comfortable" with the situation.

Thereafter, Mark went to the lobby of the building and made an anonymous call to a hotline set up by defendant's human resource's department.  During the course of the call, Mark provided his name as well as plaintiff's name.  Mark was referred to the Employee Assistance Program and Peter Bunnell, a representative from that department, contacted Mark regarding the situation. Mark relayed information regarding the DVD incident and further advised Bunnell regarding plaintiff's personal and family situation.  He further informed Bunnell that plaintiff had a history of mental issues and was emotionally volatile.  According to Mark, plaintiff had

---

[2]      Jaffe also represented defendant at this time.

6

made suicidal comments in the past, although Mark did not believe that plaintiff would harm himself at this time.

Bunnell then contacted Schoesler regarding the day's events.  Schoesler indicated that he was concerned about plaintiff's behavior, but did not believe that plaintiff was a risk of harm to himself or others.  Mark contacted Bunnell a second time and informed him that he learned that plaintiff had threatened to "kill" or "take out" Stafford.  At his deposition, however, Mark indicated that he did not believe his father was a threat to Stafford.  Bunnell became concerned that plaintiff might harm Stafford.  Bunnell and Mark contacted Stafford and the two informed Stafford of the possible threat plaintiff posed to his safety.  No one called the police or plaintiff regarding the Stafford incident.

Thereafter, Barbara Aurecchione, an Employee Relations Advisor interviewed members of the Telerico Group.  Aurecchione learned that plaintiff focused most of his time on his divorce and that the environment was stressful.  Miner indicated that plaintiff appeared to be distraught just prior to the DVD incident.  She further indicated that she believed plaintiff might be desperate and that he might "snap."  She spoke with Schoesler and discussed the situation. According to Aurecchinoe, Schoesler informed her that Mark was trying to create a problem with his father in order to position himself to get plaintiff's accounts.  Schoesler denies having made these statements.  According to Schoesler, he and Aurecchinoe agreed that plaintiff and Mark needed to refocus their energies on work.  They further concluded that the Telerico Group should be separated.  Thelander was kept apprised of the situation and, in an email exchange dated September 8, 2006, Thelander indicated that he believed plaintiff should be placed on leave.

7

On September 12, 2006, plaintiff was arrested and charged with felony intimidation stemming from the threat allegedly made to Stafford.  Jaffe informed Schoesler that he believed the issue surrounding the arrest resulted from questionable conduct on the part of Stafford. Schoesler denies discussing this with Jaffe.  The news reported the arrest and mentioned that plaintiff was a "big wig" employed by defendant who allegedly threatened to kill his wife's divorce attorney.  Other news outlets also reported the story.

Once on leave, defendant began "strategizing" about how to retain clients. Mark contacted plaintiff's clients and reported his progress to Bernard and Thelander.  Mark replaced plaintiff as the cooridantor for the syndicate work and the work was reallocated to Joe Bevak, age 36, Charlie Bergman, age 35, Matt Maxwell, age 41, and Dick Chernus, age 61.  According to Mark, there were no "new players," but the syndicate business was restructured.  It appears that Maxwell was hired approximately a few weeks prior to defendant placing plaintiff on leave. Mark received an increase in his pay as a result of the reallocation.

Shortly thereafter, Marc Rothchild, a 39 year old financial advisor was arrested for showing nude pictures of his children to an exotic dancer.  The story appeared on the news and Rothchild was identified as an employee of defendant.   In fact, the news reported the arrests of Rothchild and Telerico and stated, "[w]hat is going on at that place?"

The next day, management arranged a conference call to discuss the "termination, resignation or retirement" of plaintiff and Rothchild.  The following day, defendant terminated Rothchild, but noted that "[plaintiff] will take a little more planning."

After plaintiff's arrest, defendant determined that plaintiff could no longer be employed. According to defendant, it reached this conclusion based on the following,

8

- erratic behavior at work;

- absenteeism;

- customer complaints and heightened supervision;

- impact of his divorce of his work;

- negative publicity;

- his arrest;

- the gun DVD incident;

- safety concerns for employees; and

- lack of client coverage

Thelander, James Chahine, the Regional Managing Director of the Mid-East Region, and Brett Bernard, the Division Director of the Central Division, decided to offer plaintiff the option of resigning or accepting benefits under the CTP.

On October 12, 2006, Chahine, Thelander, Schoesler, and a security guard met with plaintiff to discuss these options.  According to plaintiff, Thelander indicated that he would "show [plaintiff] how to retire a very rich man."  In response, plaintiff indicated that he was not interested in retiring.  According to Bernard, who was not present at the meeting, plaintiff still had the opportunity to return to work.[3]  Based on the meeting, however, plaintiff understood that, in the event he did not retire, he would be terminated.

On November 7, 2006, Aurecchione took a handwritten note regarding plaintiff, which provides,

---

[3]      It is clear from Bernard's deposition testimony that he is "fuzzy" on the timeline of the events surrounding the fall of 2006.

Spoke w/ Adam Schoesler.  He indicated that [management] sat down with [plaintiff] & are trying to get him to retire based on his antics in the workplace.  They have arranged for his son to take over the biz.

On November 13, 2006, plaintiff submitted a letter from his attorney to defendant indicating that he wished to continue working but, in order to avoid signing a noncompete, he was forced to resign.

As a result, defendant afforded plaintiff "retirement" treatment under defendant's Financial Advisor Capital Accumulation Plan ("FACAAP"), Growth Award Plan, and Wealthbuilder plan.  Under the plans, plaintiff received $3,407,784.33.

Following his resignation, his former accounts were serviced by the remaining members of the Telerico Group.  Mark informed Thelander and Bernard that he intended to stay with defendant for "at least another twenty years."  Shortly thereafter, the Telerico group merged with another team and became known as the Penton-Telerico group.  This team consisted of Mark, Miner, Covert, Richard Penton, and Steve Penton.  It is not clear whether the accounts serviced by other advisors, *i.e.*, Bevak, Bergman, Maxwell, and Chernus, while plaintiff was on leave, remained with these advisors or were serviced by the Penton-Telerico group.

Defendant paid plaintiff the money due under the plans.  In November of 2007, defendant asked plaintiff whether he was working for a competitor.  Defendant provided a list of competitive companies in order to assist plaintiff in his response.  In addition, the letter outlines activities that constitute competition.  Plaintiff informed defendant that he was not employed by a competitor.  On February 14, 2008, within two years of resigning, plaintiff commenced employment with Butler Wick & Co. ("Butler Wick").  Butler Wick is not on the list of competitive companies provided to plaintiff.  As of March 2008, defendant knew of plaintiff's

10

employment with Butler Wick and sent plaintiff a letter demanding its money back.

Thereafter, plaintiff filed this lawsuit asserting six claims for relief.  Count one is a claim for age discrimination asserted under federal law.  Counts two and three assert claims for retaliation under state and federal law, respectively.  Count four is a claim for unfair competition.  Count five is a claim for tortious interference with business relations and prospective business relations.  Count six is a claim for intentional infliction of emotional distress.  Defendant filed a counterclaim asserting two claims for relief.  Count one is a claim for breach of contract and count two is a claim for unjust enrichment.

Defendant moves for summary judgment on all claims in the complaint and counterclaim.  Plaintiff opposes the motion.

## STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

**ANALYSIS**

1. Count one (federal age discrimination)

A.  Direct evidence

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  "Under the ADEA, a plaintiff may demonstrate age discrimination by presenting either direct or indirect (circumstantial) evidence."  *Wharton v. Gorman-Rupp Co.*, 309 Fed.Appx. 990 (6th Cir. Feb. 11, 2009)(*citing, Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir.1998)).

> Direct evidence is evidence that proves the existence of a fact without requiring any inferences. Comments "from the lips" of the employer proclaiming his or her ... animus constitute direct evidence of discrimination.  The statement must not be isolated,

12

ambiguous, or abstract and must be a remark "by the employer."  A discriminatory
comment is attributable to the employer when it is made by a "decision maker."

*Id*. (Internal citations and quotations omitted).

Plaintiff argues that he has presented sufficient direct evidence of age discrimination to
avoid summary judgment.  Specifically, plaintiff points out that Thelander requested that he
retire after receiving assurances that Mark would work for defendant for "at least another 20
years."  He further points out that defendant encouraged Mark to "take over" his father's
business.

In response, defendant argues that generalized statements regarding retirement do not
constitute direct evidence of age discrimination under Sixth Circuit precedent.  Defendant further
claims that none of the other "comments" constitute direct evidence of age discrimination.  Nor
are they supported by the evidence.

Upon review, the Court agrees with defendant that plaintiff fails to present direct
evidence of age discrimination.  In *Scott v. Potter*, 182 Fed. Appx. 521 (6th Cir. May 31, 2006),
the Sixth Circuit addressed whether generalized statements alluding to retirement constitute
direct evidence of age discrimination.  In *Scott*, the plaintiff claimed that his employer stated,
"why don't you retire and make everybody happy?"  According to plaintiff, this remark
constituted direct evidence.  In rejecting the argument, the Sixth Circuit held that, while
comments regarding retirement *typically* are directed at older workers, it is 'typicality,' rather
than 'identity,' which requires that an inference be drawn.  *Id*. at 526.  For example, it is possible
for younger works to retire.  Because a statement such as "why don't you retire," could be based
on something other than age, *i.e.*, years of service, it does not constitute direct evidence of age
discrimination.  *Id*.  Accordingly, to the extent Thelander told plaintiff that he should retire, the

13

statements are not direct evidence of age discrimination.  The remaining statements also do not amount to direct evidence of age discrimination because they also require that inferences be drawn.  The fact that defendant may have sought assurances from Mark that he would remain employed by defendant for "twenty years," is not directly related to age.  Rather, on its face, it is related to loyalty to defendant.  Similarly, encouraging Mark to "take over" his father's business does not on its face convey an intent to discriminate based on age.  Accordingly, the Court finds that plaintiff fails to present direct evidence of age discrimination.

          B.  *McDonnell Douglas*

Where the plaintiff fails to present direct evidence of discrimination, courts analyze ADEA cases under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).[4]  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999).

To establish a prima facie claim of age discrimination under the ADEA, a plaintiff must show that: (1) he was at least 40 years old at the time of the alleged discrimination, (2) he was subjected to an adverse employment action, (3) he was otherwise qualified for the position and

---

[4]      The Supreme Court recently held that, under the ADEA, a plaintiff must prove that age was the "but for" cause of the adverse employment action in mixed motive claims.  In reaching its conclusion, the Court noted that it has not "definitively decided whether the evidentiary framework of *McDonnell Douglas*" is appropriate in ADEA cases.  *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343 (2009).  Since *Gross*, however, the Sixth Circuit has continued to apply the *McDonnell Douglas* framework to ADEA claims.  *See, e.g., Oliver v. Federated Mut. Ins. Co.*, 2009 WL 2031863 (6th Cir. July 15, 2009).

14

(4) he was replaced by a younger worker. *Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307 (6th Cir. 2007) (citing *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 547 (6th Cir. 2004)) The fourth element may be satisfied "by showing that similarly situated non-protected employees were treated more favorably." *Id.* (citing *Coomer v. Bethesda Hosp*., Inc., 370 F.3d 499, 511 (6th Cir.2004)).

    If plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Godfredson*, 173 F.3d at 371. If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's non-discriminatory explanation is a mere pretext for intentional age discrimination. *Id. See also Ercegovich*, 154 F.3d at 350.[5]

    In this case, defendant argues that plaintiff cannot establish a prima facie case of age discrimination because he cannot show that he was replaced by a younger worker or that a similarly situated non-protected employee was treated differently. According to defendant, it did not replace plaintiff. In addition, defendant argues that it terminated Rothchild, a non-protected individual, after his publicized arrest. In response, plaintiff argues that his work was redistributed to three substantially younger financial advisors. In addition, plaintiff points out that Maxwell, an individual who worked on some of plaintiff's accounts, was hired from Morgan Stanley in August of 2006, shortly before defendant placed plaintiff on a leave of absence.

---

[5]     Notably, under the *McDonnell Douglas* burden-shifting framework, only the burden of production shifts between the parties. At all times, the plaintiff retains the burden of persuasion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518 (1993) (quoting *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff further argues that other financial advisors employed be defendant committed far worse acts, yet were not terminated.  For example, plaintiff points out that defendant did not terminate employees who were alleged to be involved in the following: (1) sexual assault of a child; (2) assault because of a love triangle; (3) severe animal abuse; (4) violations of regulatory standards; and (5) date rape.  In addition, plaintiff points out that Thelander testified that there was "absolutely nothing about [plaintiff's] work performance that would have lead [sic] to his termination."

Upon review, the Court finds that plaintiff presents sufficient evidence from which a jury could conclude that plaintiff was replaced by Maxwell.  It is well-settled that,

> a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Grosjean v. First Energy Corp.*, 349 F.3d 332, 337 (6th Cir. 2003)(*quoting Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).  In his brief in opposition, plaintiff points out that Maxwell was hired approximately three weeks before plaintiff was placed on a leave of absence from which he did not return.  According to the testimony of Mark, Maxwell received a "large chunk" of plaintiff's work.  In its reply, defendant fails to address Maxwell.  Rather, defendant points out that one of the financial advisors who took over plaintiff's accounts was 61 years old. In addition, defendant points to testimony indicating that the accounts were serviced by the remaining members of the Telerico team and that it did not hire new employees to service these accounts.  Yet, Mark, the team leader, unequivocally testified that Maxwell was allocated a "big chunk" of the accounts.  Further, defendant's responses to plaintiff's interrogatories demonstrate that Maxwell was hired just prior to defendant's leave of absence.  Defendant does not address

16

this testimony in any fashion or provide the Court with any explanation surrounding Maxwell.[6]

Given that this Court must construe the evidence in the light most favorable to plaintiff, the

Court finds that plaintiff presented sufficient evidence from which a jury could conclude that

Maxwell replaced plaintiff.[7]

The parties do not dispute that defendant has pointed to a legitimate non-discriminatory

reason for the adverse employment action.  Specifically, defendant points to plaintiff's increased

absenteesim, customer complaints, heightened supervision requirement, negative publicity,

arrest, the gun DVD incident, lack of client coverage, and pending divorce.  Defendant further

points out that plaintiff's actions caused safety concerns for other employees and an

uncomfortable work environment.

In response, plaintiff argues that the evidence demonstrates that defendant's reasons for

demanding his resignation are pretext for unlawful discrimination.  In order to demonstrate

---

[6]     Plaintiff cites to *McElroy v. Philips Med. Systs. North America, Inc.*, 127 Fed. Appx. 161 (6th Cir. Feb. 18, 2005) in support of its contention that plaintiff was not replaced.  In *McElroy*, plaintiff alleged that he was replaced by a new hire who obtained some of plaintiff's accounts both before and after his termination.  *McElroy* is easily distinguishable, however, because the replacement was hired a year before plaintiff's discharge.  Here, Maxwell was hired just weeks before defendant placed plaintiff on leave.

[7]     The Court finds that plaintiff fails to point to sufficient evidence demonstrating that a similarly situated employee was treated differently.  Although plaintiff points out that certain financial advisors in offices around the country engaged in various acts for which they were not terminated, plaintiff wholly fails to establish that any of these individuals were similarly situated to plaintiff.  In fact, plaintiff fails to point to any evidence on which the Court could even analyze whether these employees were similarly situated to plaintiff.  The only information provided about these other individuals is the nature of the alleged misconduct.

17

pretext, "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject the defendant's explanation' and infer that [defendant] 'intentionally discriminated' against him." *Leonard v. Twin Towers*, 6 Fed.Appx. 223, 228 (6th Cir. 2001)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993)).  As recognized by the Sixth Circuit, "[t]he Supreme Court recently held that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* (*quoting Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)).  Finally, the Sixth Circuit reiterated that pretext may be proven by setting forth evidence "(1) that defendant's proffered reasons have no basis in fact, (2) that the proffered reasons did not actually motivate the discharge, or (3) that they were insufficient to motivate discharge."  *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084.

Plaintiff points out that Bernard testified that, as of October 9 or 10, 2006 plaintiff could have continued working for defendant.  The news reports surrounding plaintiff's arrest were aired prior to October 9.  Thus, plaintiff argues that all of the events defendant cites as reasons for his termination are false.  In addition, plaintiff points out that defendant did nothing to address many of the issues, *i.e.*, customer complaints/NYSE investigation, the divorce, attendance issues, and disputes with his son, until after plaintiff indicated he did not want to retire.  Plaintiff further points out that Thelander indicated that plaintiff's work performance did not lead to his termination and that plaintiff remained one of the most productive financial advisors at the firm.  In addition, plaintiff claims that defendant's contention that it terminated plaintiff because of the DVD incident, arrest, and local news coverage regarding the incident is

18

not worthy of belief. According to plaintiff, management knew that Mark was attempting to orchestrate a problem for his father so that Mark could take over plaintiff's clients. Plaintiff notes that after Aurecchione conducted her investigation into the DVD incident, she recommended that plaintiff return to work. Yet, Thelander placed plaintiff on leave "for reasons he cannot remember." In addition, plaintiff claims that defendant "prepared a defense" by terminating Rothchild. According to plaintiff, defendant's motivation is underscored by an email containing stating, "[t]hey terminated Rothchild today. Telerico is definitely going to take a little more planning."

In response, defendant points out that plaintiff does not dispute that he engaged in the conduct cited as the reason for his termination. Nor does plaintiff dispute that such conduct may warrant termination. Defendant points out that there is no evidence suggesting that it had a preference for younger workers. In fact, plaintiff points out that 59% of the financial advisors in its Cleveland office are within the protected class and 15% are over age 60. In addition, defendant points out that, after plaintiff retired, it hired three financial advisors older than plaintiff. Plaintiff further points out that the testimony demonstrates that management was concerned about plaintiff's issues, particularly his lack of client services, absenteeism, and messy divorce. Plaintiff also argues that even if Mark seized on the DVD incident in order to obtain his father's accounts, such proof does not demonstrate that defendant discriminated against plaintiff because of his age.

Upon review, the Court finds that summary judgment is warranted on plaintiff's ADEA claim because plaintiff fails to present sufficient evidence to establish that defendant's reasons for termination were pretext for unlawful discrimination. Plaintiff does not argue that he did not

engage in the conduct allegedly supporting the termination, nor does plaintiff claim that the

conduct would be insufficient to justify discharge.  Rather, it appears that plaintiff is arguing that

the proffered reasons did not actually motivate the discharge.  Although plaintiff points to certain

inconsistencies in defendant's testimony, plaintiff fails to present sufficient evidence suggesting

that *age* is the factor that motivated the discharge.  For example, plaintiff notes that Bernard

testified that plaintiff could have continued to work for defendant as of October 9 or 10, 2006,

even though the news reports aired prior to October 9th.[8]  Similarly, plaintiff points out that

Aurecchinoe recommended that plaintiff be allowed to return to work following the DVD

incident, yet Thelander placed plaintiff on leave for reasons he could not recall.  This evidence,

however, does not assist plaintiff in establishing that *age* somehow motivated defendant's

decision to terminate plaintiff's employment.   Nothing suggests that Thelander could not recall

what motivated the decision to *terminate* plaintiff.  The fact that he could not recall the precise

conduct that motivated the decision to place plaintiff on leave does not suggest that he was

motivated by age.  Plaintiff further points out that Thelander testified that plaintiff's performance

did not lead to his termination and that plaintiff remained one of the most productive financial

advisors in the firm.  Defendant, however, never claimed that it terminated plaintiff based on his

failure to bring in or retain clients.  Thus, the fact that Thelander admitted that plaintiff was

successful is not relevant to demonstrating pretext.  In addition, the Court agrees with defendant

that the fact that defendant may have believed Mark was attempting to orchestrate a problem for

his father does not demonstrate pretext.  At no point does plaintiff deny that he engaged in the

---

[8]     Bernard also testified that he was fuzzy about the timeline of
events.

behavior cited for termination.  Moreover, the testimony of Miner and Colvert, indicating that they feared for their safety, is not in dispute.  Accordingly, whether Mark seized on his father's actions in no way suggests that defendant terminated plaintiff due to his age.  Plaintiff further argues that Rothchild's arrest and termination were simply "fortuitous" acts that allowed defendant to prepare a defense for defendant's termination.  Simply put, there is no evidence supporting this theory.  The only evidence plaintiff points to that is even arguably related to age is his claim that defendant "did nothing" to address his behavior at work until after he refused to retire.  The evidence, however, demonstrates that management was concerned about his work related issues, particularly the effect his divorce and family relationships were having on his work life. Moreover, plaintiff strenuously argues that defendant terminated plaintiff in order to transition clients to a younger financial advisor.  Terminating plaintiff, however, would seem to cut against this argument.  Plaintiff would have been free to take all of his clients elsewhere.  Thus, it does not appear that terminating plaintiff would necessarily serve this purpose in any event.  In all, the Court finds that plaintiff fails to present evidence from which a reasonable jury could conclude that defendant's proffered reasons for termination are pretext for age discrimination.[9]

---

[9]    In *Gross*, the Supreme Court held that a plaintiff must prove that age was the "but for" cause of the adverse employment action in mixed motive claims.  *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343 (2009).  Although the Court did not analyze the claim in the context of pretext, this Court questions whether *Gross* would also apply in analyzing pretext. Where a defendant has presented a legitimate nondiscriminatory reason for termination, it is possible the mixed motive analysis would apply.  In that case, plaintiff would have to establish that age was *the* "but for" cause of the termination.  To the extent *Gross* applies, the Court finds that plaintiff fails to present sufficient evidence from which a jury

21

2.  Counts two and three (state and federal law retaliation)

In counts two and three, plaintiff claims that defendant retaliated by filing a counterclaim seeking reimbursement for monies paid under the FACAAP, Growth Award Plan, and Wealthbuilder plan.  According to plaintiff, defendant knew that he worked for Butler Wick, yet did not demand repayment of the monies until after plaintiff filed this lawsuit.

The parties recognize that, in order to prove a claim for retaliation, plaintiff must prove that (1) he engaged in a protected activity; (2) defendant knew of the protected activity; (3) the defendant took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action.  *See, Lindsay v. Whirlpool Corp.*, 295 Fed. Appx. 758, 768 (6th Cir. Oct. 2, 2008).  In the event plaintiff is able to establish a prima facie case, the burden shifts to defendant to articulate a non-retaliatory reason for the adverse action.  *Dixon v. Gonzales*, 481 F.3d 324 (6th Cir. 2007).  As with discrimination claims, if defendant is able to articulate a non-retaliatory reason for its actions, the burden shifts back to plaintiff to prove that the proffered reason was not the true reason for the action.  *Id*.[10]

In this case, defendant argues that it is entitled to summary judgment because plaintiff cannot establish a casual connection between the protected activity and the filing of the counterclaim.  According to defendant, plaintiff must show some temporal proximity between

_____

could conclude that age was the "but for" cause of plaintiff's termination.  The Court rejects plaintiff's claim that *Gross* is inapplicable because the case arose in the context of a jury instruction as opposed to summary judgment.

[10]     The parties do not dispute that state and federal retaliation claims are analyzed similarly.

the two events.  Defendant points out that plaintiff filed a charge of discrimination nearly two

years before defendant demanded that plaintiff return the monies paid under the plans.  In

addition, defendant points out that plaintiff began work at Butler Wick on February 14, 2008,

and demanded that the monies be returned on March 28, 2008–before plaintiff field this lawsuit.

Based on these facts, defendant argues that plaintiff cannot establish temporal proximity.

Defendant further argues that no evidence exists to establish either a retaliatory motive on its

part or that defendant treated plaintiff differently from other financial advisors.  According to

defendant, plaintiff is not immunized from his contractual obligations simply because he filed a

discrimination claim.  Defendant points out that it routinely disqualifies financial advisors who

work for competitors from receiving monies under the plans.

     In response, plaintiff points out that defendant knew by March of 2008 that plaintiff

commenced employment with Butler Wick, yet waited until after plaintiff filed this lawsuit to

seek redress.  In addition, plaintiff points out that defendant never sought to recover monies paid

under the plan from any other financial advisor.  Plaintiff further notes that defendant's corporate

representative testified that she "guessed" that counsel determined whether to sue for recovery of

the monies and that defendant wholly failed to comply with the contract in determining that

Butler Wick is a competitor.  According to plaintiff, the letter to plaintiff demanding repayment

of the monies did not mention that legal action would be taken.  As such, plaintiff argues that a

causal connection can be established.

     Upon review, the Court finds that defendant is entitled to summary judgment on

plaintiff's retaliation claims.  As defendant points out, plaintiff instituted a charge with the

EEOC alleging age discrimination on October 19, 2006, nearly *two years* before defendant took

23

"adverse action" against plaintiff. During this time, defendant paid plaintiff pursuant to the plans, even though the charge was pending. Moreover, within weeks of plaintiff accepting employment with Butler Wick, defendant demanded that the monies be returned. This occurred *prior* to the filing of the lawsuit. The fact that defendant did not threaten to file a lawsuit is of no moment. Defendant clearly indicated its intent to recoup the monies. The Court agrees with defendant that plaintiff cannot be insulated from damages resulting from his alleged breach of the plans simply because he filed a lawsuit. Moreover, defendant points out that it refused to compensate many financial advisors who violated the terms of the plans. Given the timeline of the events surrounding the EEOC charge, the payment of monies while the charge was pending, the alleged breach by plaintiff, and the timely demand for repayment, the Court finds that no reasonable juror could conclude that a causal connection exists between the protected activity and the adverse action. Accordingly, summary judgment in favor of defendant is warranted.[11]

      3.      Count four (unfair competition)

In count four, plaintiff alleges that defendant engaged in unfair competition by making misrepresentations in public filings. In addition, plaintiff argues that defendant sent out a letter to clients stating that, "...many clients have received [a mailing] from a former Merrill Lynch employee stating that 'The Telerico Group' has relocated or changed firms. **This is not true**."

In response, defendant argues that the statements made regarding the NYSE investigation and the customer complaints are privileged and that plaintiff cannot show that defendant acted with actual malice. Defendant further argues that plaintiff cannot establish damages. In

---

[11]      The Court further notes that, even if plaintiff could establish a prima facie case, reasonable minds could only conclude that defendant's actions were not pretext for unlawful retaliation.

addition, defendant points out that the NYSE investigation and customer complaints that defendant reported on the Form U-4 actually occurred.  In addition, plaintiff executed the forms himself.  Plaintiff also claims that the letter sent to defendant's former clients is accurate.

Upon review, the Court finds that summary judgment in favor of defendant is warranted. Generally speaking, unfair competition claims are designed to prevent a party from using deception in order to pass off his goods as those of another.  *See, Molten Metal Equip. v. Metaullics Systs., Co.*, 2000 WL 739470 at *5 (Oh. Ct. App. 8th Dist. June 8, 2000)*(citing Drake Medicine Co. v. Glessner*, 67 N.E. 722 (Ohio 1903)).  "The concept of unfair competition may also extend to unfair commercial practices such as...publication of false statements designed to harm the business of another."  *Id*.  In this case, plaintiff argues that certain items were not properly reported to regulatory agencies.  In his brief, plaintiff does not identify any particular statement he believes supports this particular claim.  The Court finds, however, that assuming the relevant statements are those set forth in the Form U-4s, plaintiff cannot establish a claim for unfair competition.  Plaintiff himself signed the forms for submission to the agencies.  As such, plaintiff cannot now claim that the statements were erroneous and amount to unfair competition. In addition, the Court has reviewed the letter sent to defendant's customers in response to correspondence apparently sent by plaintiff.  The Court finds that the letter is insufficient, as matter of law, to support an unfair competition claim.  Contrary to plaintiff's argument, the Court does not find the letter to be deceptive.

4.      Count five (tortious interference)

In count five, plaintiff alleges that defendant engaged in unfair competition by publishing the erroneous regulatory disclosures.  In addition, in his brief in opposition, plaintiff claims that

25

other actions undertaken by defendant support his claim.  Specifically, plaintiff argues that defendant forced plaintiff to take a leave of absence away from his clients, redistributed his clients to younger financial advisors, allowed his securities license to lapse, and publically stigmatized him.

Defendant argues that it is entitled to summary judgment because the statements in the Form U-4 and U-5 are privileged.  In addition, defendant claims that plaintiff cannot establish actual malice.  Defendant further argues that it cannot be liable for tortious interference because the business relationships at issue were defendant's own clients.  According to defendant, one cannot be liable for tortiously interfering with its own business relationships.  Defendant further argues that plaintiff cannot prove that he suffered any harm.

"The tort of interference with business relationships occurs when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another." *A&B-Abell Elevator Co. v. Columbus/Central Ohio Building & Constr. Trades Council*, 651 N.E.2d 1283 (Ohio 1995). The elements of tortious interference with a business relationship are (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc*., 774 N.E.2d 775 (Oh. Ct. App. 3rd Dist. 2002)

A defendant is not liable for tortious interference with a business relationship if he can show a qualified privilege, as in a defamation action. *Gall v. Dye*, 1999 WL 692440, *4 (Oh. Ct. App. 9th Dist. 1999)  "Such a privilege must be overcome by a showing of actual malice..."  *Id.*

26

In order to establish actual malice, plaintiff must prove that defendant acted in an unjustified or improper manner.  *Chandler and Assoc., Inc. v. America's Healthcare Alliance, Inc.*, 709 N.E.2d 190 (Oh Ct. App. 8th Dist. 1997).

"A publication is privileged when it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned."  *A & B-Abell*,  651 N.E.2d 1283, 1290 (citing *Hahn v. Kotten*, 331 N.E.2d 713 (Ohio 1975)). In *Hahn*, the court explained:

> A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or whether the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits.

*Id.* at 719..

Upon review, the Court finds that plaintiff cannot establish a claim for tortious interference.  As an initial matter, the Court finds that the statements defendant made to regulatory authorities are entitled to a qualified privilege.  Defendant reported the customer complaints and the existence of the NYSE investigation.  Plaintiff argues that defendant failed to properly amend the registration statements in order to reflect that the NYSE investigation closed. However, the Court finds that plaintiff fails to set forth sufficient evidence from which a jury

27

could conclude that defendant's failure to properly report the status of the investigation was done with actual malice.  As set forth above, the fact that plaintiff signed off on the statements negates any finding of actual malice.  Accordingly, plaintiff cannot establish a claim for tortious interference.  Moreover, plaintiff fails to identify any damages he suffered as a result.  Rather, plaintiff indicates that the damages "are obvious" because plaintiff "could not service his clients for nearly two years."  Plaintiff fails to explain how any actions taken by defendant resulted in plaintiff's inability to service *his* clients.  Nor does plaintiff articulate any actual loss from this alleged damage.  Accordingly, for this additional reason, the Court concludes that defendant is entitled to summary judgment with respect to plaintiff's claim for tortious interference with business relationships.

     5.       Count six (intentional infliction of emotional distress)

Count six alleges intentional infliction of emotional distress**.**  Plaintiff identifies no conduct allegedly engaged in by defendant that is different from the conduct addressed above.  Having concluded that the conduct identified by plaintiff is not actionable, the Court finds that plaintiff's claim for intentional infliction of emotional distress also fails.

     6.       Counterclaim one (breach of contract)

In counterclaim one, defendant argues that it is entitled to summary judgment because the plans clearly provide that if plaintiff commences employment with a competitor, he forfeits his rights under the plans.  According to defendant, Butler Wick is a competitor because it provides many of the same services provided by defendant.  Specifically, both entities have a private client division, offer wealth management, retirement, trust planning, and insurance and annuity products and services.  Defendant points out that plaintiff was previously employed in

28

defendant's private client division and is now employed in the same division at Butler Wick.  In addition, defendant notes that plaintiff described Butler Wick as a "full service brokerage firms" in a letter he sent to prospective clients, including what appear to be clients he serviced while employed by defendant.[12]  Defendant also points out that another judge in this district concluded that Butler Wick is a competitor of defendant.

In response, plaintiff does not directly dispute that Butler Wick is a competitor.  Rather, plaintiff relies on the argument that defendant cannot recover under the plans because it failed to comply with a condition precedent to recovery.  Specifically, plaintiff argues that the plans require that either the "Committee (or its designee)" or the "Administrator" determine whether a particular entity is a competitor.  Since neither the Committee nor the Administrator, as those terms are defined in the plans, ever concluded that Butler Wick is a competitor, defendant cannot seek a return of the monies paid to plaintiff.  Plaintiff further argues that defendant sent a list of competitors to plaintiff and Butler Wick did not appear on the list.  In his statement of facts, plaintiff claims that Butler Wick did not have an underwriting department and, as such, plaintiff cannot perform syndicate work.

Upon review, the Court finds that summary judgment in favor of defendant is warranted with respect to the FACAAP and Growth Award plans.  The Court rejects plaintiff's argument that defendant forfeited its rights under these plans because neither the Committee nor the Advisory Division determined Butler Wick to be a competitor of defendant.  The FACAAP and Growth Award plans provide as follows,

_____

[12]     The letter sent by plaintiff refers to "continued servicing" of accounts and the transfer of assets.  In addition, plaintiff does not dispute that the letter was sent to defendant's clients.

> Employment by Competitor.  Notwithstanding the foregoing, if within two years of the date of your Retirement..., you commence employment or become affiliated in any way with a company determined by the Committee [or Advisory Division] (or its designee) to be a retail brokerage competitor of the Company or an Affiliate, any amount paid to you under this section shall be forfeited...

(Def. Exs. 23 at p. 8, 24 at ¶ 7.4).[13]

Plaintiff argues that the Committee or Advisory Division must make a determination that plaintiff is  working for a competitor before defendant can seek forfeiture.  According to plaintiff, these provisions are conditions precedent to defendant's right to recoup the monies paid to plaintiff.

Under New York law[14], "conditions are not favored...and in the absence of unambiguous language, a condition will not be read into [an] agreement."  *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1099-1100 (2d Cir. 1992).  Generally speaking, in order to establish a condition precedent, parties will employ language evidencing an intent to create a condition.  Such language includes phrases such as, "if," "on condition that," "provided that," "in the event that," and "subject to."  *Id*. at 1100.  "In determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition."  *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E2d 415, 418 (N.Y. Ct. App. 1995).  A promise or constructive condition is subject to the doctrine of substantial compliance.  *Id*.; *Maxim Group, LLC, v. Life Partners Holdings, Inc.*, 2008 WL 4185717 (S.D.N.Y. Sept. 4, 2008)(absent express language indicating

---

[13]    The FACAAP plan refers to the "Committee," while the Growth Award plan refers to the "Advisory Division."

[14]    All of the plans provide for the application of New York law.

30

the existence of a condition, forfeiture will not result); *Singapore Recycle Centre Pte Ltd. v. Kad Int'l Marketing, Inc.*, 2009 WL 2424333 at * 8-9.

With regard to the FACAAP and Growth Award plans, there is no language indicating that a determination by either the Committee or Advisory Division is a condition precedent to defendant's right to recoup monies under the plans. Accordingly, the Court finds that the language in those plans is not a condition precedent and compliance with the "promise" is subject to the doctrine of substantial compliance. In this case, the Court finds that reasonable minds could only conclude that defendant substantially complied with this provision. Shortly after learning of plaintiff's employment with Butler Wick, defendant sent a letter to plaintiff informing him that his employment violated the plans. Thus, defendant clearly considered plaintiff to be working for a competitor. The fact that defendant made this determination through channels other than those specifically delineated in the plans does not warrant forfeiture of defendant's rights under the agreements. The Court concludes that defendant substantially complied with the provision in the FACAAP and Growth Award plans.

Defendant cites a wealth of evidence in support of its contention that Butler Wick is a competitor. In response, plaintiff simply points out that Butler Wick does not have an underwriting department and, as such, defendant cannot perform syndicate work. As an initial matter, the Court is not convinced that it need reach this issue since the plans provide that *defendant* is to determine whether a particular entity is a competitor. Regardless, the Court finds the fact that defendant does not have an underwriting department is insufficient to create a genuine issue of material fact as to Butler Wick's status as a competitor. In light of the overwhelming evidence provided by defendant, the Court finds that reasonable minds could only

31

conclude that Butler Wick competes with defendant.

Plaintiff also points out that defendant sent him a list of competitors and Butler Wick did not appear on the list.  Defendant sent the list to plaintiff along with a questionnaire confirming that plaintiff was not in violation of the plans.  While Butler Wick does not appear on the list, the list clearly indicates that the list is not inclusive.  It goes on to note that it considers entities that provide certain services, including those with a private client division, to be competitors.  Thus, the fact that Butler Wick does not appear on the list does not suggest that defendant did not consider it to be a competitor.

In all, the Court finds that plaintiff breached the provisions of the FACAAP and Growth Award plan.  Defendant, however, failed to provide the Court evidence supporting an award of damages.  Accordingly, that issue remains pending.

On the other hand, the Court finds that the provision in the Wealthbuilder plan contains a condition precedent.  That plan provides as follows,

> Forfeiture Procedure. A participant's Account...is subject to forfeiture in the event the Administrator, in his or her sole discretion, determines that the Participant has been in Competition with the Company at any time during the period ending two years after the Participant's Qualifying Termination.

(Def. Ex. 25 at p.7)

Under New York law, the phrase "in the event" creates a condition precedent.  Defendant offers no argument in support of any other construction.[15]  As such, the Court concludes that the doctrine of substantial compliance is inapplicable.  Given that defendant did not comply with the condition, the Court finds that defendant may not recover monies awarded under the

---

[15]     Defendant erroneously argues that the Court need not reach the issue.

Wealthbuilder plan.[16]

       7.      Counterclaim two (unjust enrichment)

In counterclaim two, defendant alleges that it is entitled to recover the monies paid under the plans based on a theory of unjust enrichment.  It is well settled, however, that a party may not recover in quasi-contract in the face of an express contract governing the same subject matter. *Ullmann v. May*, 72 N.E.2d 63 (Ohio 1947), *paragraph four of the syllabus. See also Joseph Oldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc.*, 1995 WL 276804 (Ohio App. 2nd Dist. May 10, 1995) (citing *Williams v. Goodyear Aircraft Corp.*, 85 N.E.2d 601 (Ohio App. 9th Dist. 1948)); *City of Cincinnati v. Cincinnati Reds*, 483 N.E.2d 1181 (Ohio App. 1st Dist. 1984)); *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975). In this case, the plans specifically address forfeiture as a result of competitive actions.  In light of these provisions, plaintiff cannot fall back on a theory of unjust enrichment.  Accordingly, the Court finds that summary judgment in favor of plaintiff is warranted.

    <u>**CONCLUSION**</u>

For the foregoing reasons, Merrill Lynch's Motion for Summary Judgment is GRANTED as to all counts in the complaint.  In addition, the motion is GRANTED IN PART as to liability on count one of the counterclaim.  The Court *sua sponte* grants summary judgment in part in favor of plaintiff with respect to count one of the counterclaim.  Plaintiff is also entitled to summary judgment on count two of the counterclaim.  The sole remaining issue in this case is

---

[16]    The Court recognizes that the outcome in this particular case may seem incongruous in that two different conclusions are reached with respect to nearly identical provisions. The law is clear, however, that conditions precedent are disfavored.  Whether a condition precedent exists is generally a matter of semantics.

the amount of damages defendant suffered as a result of plaintiff's breach of the FACAAP and

Growth Award plans.  Defendant is to submit a motion for summary judgment on this issue no

later than September 14, 2009.  Plaintiff may submit a brief in opposition no later than

September 28, 2009.  Any reply brief is due no later than October 5, 2009.

      IT IS SO ORDERED.


               /s/ Patricia A. Gaughan
              PATRICIA A. GAUGHAN
              United States District Judge

Dated: 8/28/09